**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| David R. Herendeen, | : | Case No. 1:13 CV 1202 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
| Defendant, | : | **RECOMMENDATION** |

### I. INTRODUCTION

Plaintiff David R. Herendeen ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and 423 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 16 and 17). For the reasons that follow, the Magistrate recommends that the decision of the Commissioner be affirmed.

### II. PROCEDURAL BACKGROUND

On August 16, 2010, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 11, p. 185 of 523). In his application,

Plaintiff alleged a period of disability beginning August 1, 2008 (Docket No. 11, p. 185 of 523). Plaintiff's claim was denied initially on October 19, 2010 (Docket No. 11, p. 117 of 523), and upon reconsideration on February 14, 2011 (Docket No. 12, p. 124 of 523). Plaintiff thereafter filed a timely written request for a hearing on April 13, 2011 (Docket No. 11, p. 131 of 523).

On November 29, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Thomas M. Randazzo ("ALJ Randazzo") (Docket No. 11, pp. 33-95 of 523). Also appearing at the hearing was a medical expert specializing in family medicine and an impartial Vocational Expert ("VE") (Docket No. 11, pp. 62-93 of 523). ALJ Randazzo found Plaintiff to have a severe combination of obesity, obstructive sleep apnea, left pes cavus foot deformity, and bipolar disorder with an onset date of August 1, 2008 (Docket No. 11, p. 20 of 523).

Despite these limitations, ALJ Randazzo determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through his date last insured, June 30, 2011 (Docket No. 11, p. 20 of 523). ALJ Randazzo found Plaintiff had the residual functional capacity to perform medium work with the following additional limitations: (1) occasional climbing of ramps and stairs; (2) no climbing of ladders, ropes, or scaffolds; (3) frequent balancing, stooping, kneeling, crouching, and crawling; (4) only simple and routine tasks; (5) no tasks that involve high production quotas and strict time requirements; (6) no tasks that involve arbitration, negotiation, or confrontation; and (7) only tasks that involve superficial interaction with coworkers and the public (Docket No. 11, p. 24 of 523). Plaintiff's request for benefits was therefore denied (Docket No. 11, p. 29 of 523).

On May 30, 2013, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of his denial of DIB (Docket No. 1). In his pleading, Plaintiff alleged

that the ALJ erred by improperly rejecting the opinion of Plaintiff's treating nurse practitioner (Docket No. 16). Defendant filed its Answer on August 21, 2013 (Docket No. 10).

### III. FACTUAL BACKGROUND

#### A. ADMINISTRATIVE HEARING

An administrative hearing convened on November 29, 2011, in Cleveland, Ohio (Docket No. 11, pp. 33-95 of 523). Plaintiff, represented by counsel Rachel Wilson, appeared and testified (Docket No. 11, pp. 39-62 of 523). Also present and testifying was medical expert Dr. Cathy A. Krosky, MD ("Dr. Krosky") (Docket No. 11, pp. 62-81) and VE Robert A. Mosley ("VE Mosley") (Docket No. 11, pp. 81-93 of 523).

##### 1. PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff resided with and cared for his twenty-four year old mentally disabled son (Docket No. 11, pp. 39, 52 of 523). Plaintiff indicated that his son received Supplemental Security Income ("SSI"), allegedly for "mood disorder, bipolar, [and] depression" (Docket No. 11, pp. 45-46 of 523). Plaintiff testified that he last worked in 2008 moving inventory at a furniture store (Docket No. 11, p. 41 of 523). When asked why he left that job, Plaintiff stated he lost interest in the position (Docket No. 11, p. 42 of 523). Plaintiff also testified that he held a long-term job making gasoline tanks for cars from 2000 through 2005 (Docket No. 11, p. 59 of 523). When asked what prevented him from working, Plaintiff named his difficulty with memory and focusing as well as his tendency to speak very quickly (Docket No. 11, pp. 46-48 of 523).

Plaintiff testified that his mood often changed throughout the day (Docket No. 11, pp. 48-49 of 523). At some points, he would feel good and at others he would feel overly anxious (Docket No. 11, pp. 48-49 of 523). Plaintiff also reported racing thoughts (Docket No. 11, p. 49 of 523). When asked

about activities of daily living, Plaintiff stated that he can go shopping, cook meals, do laundry, and take care of his son (Docket No. 11, pp. 50, 53-54 of 523). Plaintiff also testified that, while he is able to do these things, he is "really kind of lazy" (Docket No. 11, p. 49 of 523). Plaintiff stated that he uses the computer to search for jobs, play games, check email, and communicate with a female friend in the Philippines (Docket No. 11, pp. 51-52 of 523). Plaintiff testified that he had plans to move to the Philippines but decided to stay and first take care of his disability issues (Docket No. 11, pp. 39-40 of 523). Plaintiff does not have a driver's license but can take the bus (Docket No. 11, p. 54 of 523).

### 2. MEDICAL EXPERT TESTIMONY

Dr. Krosky, a licensed family medicine practitioner, testified that Plaintiff suffered from bipolar disorder (Docket No. 11, p. 62 of 523). Based on her review of Plaintiff's medical records, especially those from Plaintiff's nurse practitioner, Dr. Krosky expressed her concern at Plaintiff's ability to withstand stress, despite the fact that his medical records indicated improvement (Docket No. 11, pp. 37-38 of 523). The expert also made mention of the possible presence of "Paragraph C"[1] criteria, although she could not be certain (Docket No. 73 of 523).

### 3. VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a line inspector/assembler as medium and low-level semi-skilled (Docket No. 11, p. 82 of 523). ALJ Randazzo then posed his first hypothetical question:

> Dr. Mosley, assuming somebody of the claimant's age, education, work experience; is able to perform work at a medium level; occasionally climbing ramps and stairs, never climbing ladders, ropes, or scaffolds; frequently balancing, stooping, kneeling, crouching, and crawling; limited to tasks that are simple and routine; precluded from tasks that involve

---

[1] Paragraph C criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

>high-production quotas of certain time requirements; precluded from tasks that involve arbitration, negotiation, or confrontation; and limited to tasks that involve superficial interaction with coworkers and the public. Would such a person be able to do that past job as line inspector?

(Docket No. 11, p. 87 of 523). The VE indicated that the hypothetical person could do Plaintiff's past work as a line inspector/assembler (Docket No. 11, p. 88 of 523). The VE also indicated that there was other work that such an individual could do, including: (1) electronics worker, listed under DOT[2] 726.687-010, for which there are 100,000 positions nationally and 1,400 in Northeast Ohio; (2) assembler, listed under DOT 712.687-010, for which there are 100,000 positions nationally and 2,000 in Northeast Ohio; (3) cuff holder, listed under DOT 685.687-014, for which there are 100,000 positions nationally and 1,400 in Northeast Ohio; and (4) bio assembler, listed under DOT 713.687-018, for which there are 100,000 positions nationally and 1,800 in Northeast Ohio (Docket No. 11, pp. 89-90 of 523).

For his second hypothetical, ALJ Randazzo questioned whether, given all the same limitations of the first hypothetical question, an individual would be able to perform Plaintiff's past work if he was also required to miss three or more days of work per month (Docket No. 11, p. 90 of 523). The VE responded in the negative (Docket No. 11, p. 90 of 523).

During cross-examination, Plaintiff's counsel posed the following hypothetical question:

>If I ask you to further assume, however, that this person is limited to simple, repetitive tasks as the judge's hypothetical; however, in performing that, the person had difficulty concentrating to the point where they'd be off-task assume 20 percent of the work day because of the symptoms they're experiencing. What effect, if any, would that have on the performance of a line inspector position or any other jobs?

(Docket No. 11, p. 93 of 523). The VE indicated that this hypothetical person would not be able to

---

[2] Dictionary of Occupational Titles.

5

perform Plaintiff's past relevant work or any other work in the national economy (Docket No. 11, p. 93 of 523).

**B.  MEDICAL RECORDS[3]**

Plaintiff initially established care at the Veterans Administration ("VA") in Cleveland, Ohio, in August 2008 (Docket No. 11, p. 424 of 523). He began treatment with nurse practitioner Ingrid Barcelona ("Ms. Barcelona") in August 2009 (Docket No. 11, p. 383 of 523). The first mention of Plaintiff's alleged mental health difficulties occurred on May 20, 2010, when Ms. Barcelona diagnosed Plaintiff with bipolar disorder I (Docket No. 11, p. 353 of 523). At that time, Plaintiff presented with fair concentration, insight, and judgment (Docket No. 11, p. 353 of 523). He was alert, oriented, cooperative, and polite during the appointment and displayed normal psychomotor activity (Docket No. 11, p. 353 of 523). Plaintiff's thought process was coherent, although some suspiciousness was noted (Docket No. 11, p. 353 of 523). His mood was euthymic and his affect was slightly elevated (Docket No. 11, p. 353 of 523). Plaintiff was assigned a Global Assessment of Functioning ("GAF") score[4] of sixty-five (Docket No. 11, p. 353 of 523). Plaintiff was placed on Depakote and Trazodone

---

[3] Although Plaintiff's records and impairments focus primarily on his mental health issues, the record also contains a few physical health documents as well. Plaintiff had bariatric surgery in 2004 (Docket No. 11, p. 459 of 523). He was hospitalized from August 22, 2008, through August 26, 2008, after complaining of chest pain (Docket No. 11, p. 324 of 523). Plaintiff had reportedly been walking seventeen miles per day for the past two weeks for charity reasons (Docket No. 11, p. 324 of 523). Plaintiff's testing was normal (Docket No. 11, pp. 324-25 of 523). Plaintiff also participated in weight management therapy from May 2010 through November 2010 (Docket No. 11, pp. 327-497 of 523) and aquatic therapy from March 2010 through May 2010 (Docket No. 11, pp. 355-61 of 523). He underwent a sleep study on September 24, 2010, after complaining of loud snoring, apnea, and daytime sleepiness (Docket No. 11, p. 407 of 523).

[4] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of sixty-five indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

(Docket No. 11, p. 354 of 523).

During an appointment on August 19, 2010, Plaintiff indicated that his son had moved in with him (Docket No. 11, p. 332 of 523). Plaintiff's status and diagnosis remained unchanged (Docket No. 11, p. 333 of 523). An update to Plaintiff's Behavioral Health Interdisciplinary Treatment Plan, done on August 20, 2010, indicated that Plaintiff suffered from chronic psychiatric symptoms without remission (Docket No. 11, p. 328 of 523). The Plan noted that Plaintiff was usually cooperative and polite and had normal psychomotor activity, although he reportedly had very fast speech (Docket No. 11, p. 329 of 523). He was alert and oriented without any deficits and had a slightly elevated, anxious mood (Docket No. 11, p. 329 of 523). Plaintiff's thought process and content were described as coherent, although some suspiciousness was noted (Docket No. 11, p. 329 of 523). His insight and judgment were fair, and he showed no signs of circumstantiality, tangentiality, flight of ideas, or loose associations (Docket No. 11, p. 329 of 523). Ms. Barcelona noted that Plaintiff's symptoms seemed to improve on medication (Docket No. 11, p. 330 of 523). Plaintiff reported that he spent time with friends, slept approximately six hours per night, had a good appetite, and was able to look for work and keep busy (Docket No. 11, pp. 328-29 of 523).

Plaintiff returned to Ms. Barcelona on October 29, 2010 (Docket No. 11, p. 397 of 523). At that time, Plaintiff reported that he had met a woman online, had fallen in love, and was preparing to move to the Phillippines to be with her (Docket No. 11, p. 397 of 523). Plaintiff's energy was good, and he reported sleeping five hours per night, although he noted some difficulty concentrating (Docket No. 11, p. 397 of 523). Plaintiff was cooperative, polite, alert, and oriented (Docket No. 11, p. 397 of 523). His mood was euthymic and his affect was slightly elevated (Docket No. 11, p. 397 of 523). Plaintiff's thought process and content were coherent, although some suspiciousness was noted (Docket No. 11,

7

p. 397 of 523). His insight and judgment were fair (Docket No. 11, pp. 397-98 of 523). Plaintiff's diagnosis and medication regimen remained unchanged and his GAF was still sixty-five (Docket No. 11, p. 398 of 523).

Plaintiff did not return to Ms. Barcelona until January 7, 2011 (Docket No. 11, p. 490 of 523). At that time, Plaintiff indicated that his mood had stabilized and he was sleeping four to six hours per night (Docket No. 11, p. 490 of 523). Plaintiff reported being able to pay his bills, but noted that he tended to mostly stay home (Docket No. 11, p. 490 of 523). His energy and concentration were fair, as were his insight and judgment (Docket No. 11, pp. 490-91 of 523). Plaintiff was cooperative, polite, alert, and oriented with no noted deficits (Docket No. 11, p. 490 of 523). His mood was euthymic and his affect was slightly elevated (Docket No. 11, p. 490 of 523). Plaintiff's diagnosis remained unchanged, but his Depakote was increased from 2,000 milligrams to 2,500 milligrams per day (Docket No. 11, p. 491 of 523). During an appointment on January 14, 2011, Ms. Barcelona indicated that Plaintiff had no restrictions (Docket No. 11, p. 486 of 523).

Plaintiff returned to Ms. Barcelona on April 5, 2011, reportedly doing fair but stressed over his son (Docket No. 11, p. 470 of 523). Plaintiff was sleeping five to six hours per night and his energy and concentration were fair (Docket No. 11, p. 470 of 523). Plaintiff reported that he tended to isolate and keep to himself (Docket No. 11, p. 470 of 523). Plaintiff was cooperative, polite, alert, and oriented without any deficits (Docket No. 11, p. 470 of 523). His mood was euthymic and his affect was slightly elevated (Docket No. 11, p. 471 of 523). While his thought process, content, insight, and judgment were fair, some suspiciousness was noted (Docket No. 11, p. 471 of 523). Plaintiff's diagnosis and medication regimen remained unchanged (Docket No. 11, p. 471 of 523). On April 11,

2011, Ms. Barcelona reported that Plaintiff had a GAF score of fifty-five[5] (Docket No. 11, p. 464 of 523).

On June 17, 2011, Plaintiff attended a follow-up appointment with Ms. Barcelona and claimed that he was doing fair but having difficulty sleeping due to his son's hyperactivity (Docket No. 11, p. 453 of 523). Again, Plaintiff was cooperative, polite, alert, and oriented with no deficits noted (Docket No. 11, p. 453 of 523). His mood was euthymic and his affect was slightly elevated (Docket No. 11, p. 453 of 523). Plaintiff's thought process was coherent, but some suspiciousness was noted (Docket No. 11, p. 454 of 523). His insight and judgment were fair (Docket No. 11, p. 454 of 523). Plaintiff's diagnosis and medication regimen remained unchanged and his GAF score was sixty-five (Docket No. 11, p. 454 of 523).

On October 18, 2011, Ms. Barcelona completed a Mental Residual Functional Capacity Assessment on behalf of Plaintiff (Docket No. 11, pp. 518-20 of 523). Ms. Barcelona reported that Plaintiff had poor or no ability to: (1) remember work-like procedures; (2) maintain attention for two-hour segments; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms; (4) perform at a consistent pace without an unreasonable number and length of rest periods; (5) accept instructions and respond appropriately to criticism; (6) deal with normal work stress; and (7) be aware of normal hazards and take appropriate precautions (Docket No. 11, pp. 518-19 of 523). Ms. Barcelona also reported that Plaintiff had a similar decreased ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) deal with the stress of semiskilled and skilled work; (4) maintain socially appropriate behavior; and (5) travel in an

---

[5] A score of fifty-five indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV at 34.

unfamiliar place (Docket No. 11, p. 519 of 523). Ms. Barcelona expected Plaintiff to be absent from work more than three times per month (Docket No. 11, p. 520 of 523).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim. First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923). At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual

functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform.  *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Randazzo made the following findings:

1. Plaintiff last met the insured status requirements of the Social Security Act on June 30, 2011.

2. Plaintiff did not engage in substantial gainful activity during the period from his

        alleged onset date of August 1, 2008, through his date last insured of June 30, 2011.

3. Through the date last insured, Plaintiff had the following severe impairments: obesity, obstructive sleep apnea, left pes cavus foot deformity, and bipolar disorder.

6. Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

7. Through the date last insured, Plaintiff had the residual functional capacity to perform medium work with the following additional limitations: (1) occasional climbing of ramps and stairs; (2) no climbing of ladders, ropes, or scaffolds; (3) frequent balancing, stooping, kneeling, crouching, and crawling; (4) only simple and routine tasks; (5) no tasks that involve high production quotas or strict time requirements; (6) no tasks that involve arbitration, negotiation, or confrontation; and (7) only tasks that involve superficial interaction with coworkers and the public.

8. Through the date last insured, Plaintiff was capable of performing past relevant work as a line inspector.

9. Plaintiff was 56 years old on the date last insured, which is defined as an individual closely approaching advanced age. Plaintiff subsequently changed age category to advanced age.

10. Plaintiff has at least a high school education and is able to communicate in English.

11. Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the Plaintiff is "not disabled" whether or not the Plaintiff has transferable job skills.

12. Through the date last insured, considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.

13. Plaintiff was not under a disability, as defined in the Social Security Act, at any time from August 1, 2008, the alleged onset date, through June 30, 2011, the date last insured.

(Docket No. 11, pp. 18-29 of 523). ALJ Randazzo denied Plaintiff's request for DIB (Docket No. 11, p. 29 of 523).

### VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

### VII. DISCUSSION

**A.    PLAINTIFF'S ALLEGATIONS**

In his Brief on the Merits, Plaintiff alleges that the ALJ erred by improperly rejecting the opinion of Plaintiff's treating nurse practitioner, Ms. Barcelona (Docket No. 16).

**B.    DEFENDANT'S RESPONSE**

Defendant disagrees and argues that the ALJ's opinion is supported by substantial evidence

13

(Docket No. 17).

C. DISCUSSION

In his only assignment of error, Plaintiff alleges that the ALJ erred by improperly rejecting the opinion of his treating nurse practitioner, Ms. Barcelona (Docket No. 16). Specifically, Plaintiff argues that, although Ms. Barcelona's opinion cannot be considered that of a treating source, as that term is defined by the Social Security Administration, the ALJ was still required to set forth the weight assigned to Ms. Barcelona's opinion as well as analyze a variety of statutory factors (Docket No. 16). This analysis, Plaintiff alleges, is something the ALJ failed to do (Docket No. 16). Upon examination of the ALJ's decision and Plaintiff's complete submitted record, the Magistrate finds Plaintiff's allegation to be without merit. Although Plaintiff's argument deals primarily with the ALJ's alleged failure to follow procedural rules, its underlying theme also concerns the ALJ's inability to properly assess Plaintiff's residual functional capacity. To understand how these arguments work together, a brief discussion of residual functional capacity is helpful.

1. RESIDUAL FUNCTIONAL CAPACITY

To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations, residual functional capacity is designed to describe the claimant's physical and mental work abilities. *Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). Residual functional capacity "is the individual's *maximum* remaining ability to do sustained work

activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). Before making a final determination a claimant is not disabled, the Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

2. **MS. BARCELONA**

To properly determine a claimant's residual functional capacity, the Commissioner must necessarily evaluate both medical and *opinion* evidence. Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite the impairment(s), and [his] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Under Social Security Regulations, "acceptable medical

sources" include: (1) licensed physicians; (2) licensed or certified psychologists; (3) licensed optometrists; (4) licensed podiatrists; and (5) qualified speech-language pathologists. 20 C.F.R. § 404.1513(a)(1)-(5). It is only these physicians and medical professionals whose opinions are presumptively entitled to controlling weight under the Regulations. Other treatment providers, including treating nurse practitioners, known under the Regulations as "other sources," are not entitled to the same controlling weight or deference to which the opinions of these treating physicians are normally entitled. *See Dudich v. Colvin*, 2013 U.S. Dist. LEXIS 158304, *30 (N.D. Ohio 2013) (*citing Starr v. Comm'r of Soc. Sec.*, 2013 U.S. Dist, LEXIS 23980, *5 (S.D. Ohio 2013)).

This does not mean that the opinions of these other sources are not relevant. Evidence from "other sources," including nurse practitioners, may be used "to show the severity of [a claimant's] impairment(s) and how it affects [his] ability to work." 20 C.F.R. § 404.1513(d). But, rather than a presumption of controlling weight, an ALJ is vested with the discretion to determine the proper weight assigned to these other sources based on the evidence of record. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532,l 541 (6th Cir. 2007). "Among the factors to be considered in evaluating the opinions of these 'other sources' are the length of time and frequency of treatment, consistency with other evidence, the degree to which the source presents relevant evidence to support the opinion, how well the opinion is explained, whether the source has a special expertise, and any other factor supporting or refuting the opinion." *Dudich*, 2013 U.S. Dist. LEXIS 158304 at *30-31 (*citing* 2006 SSR LEXIS 5, *4-5 (2006)). An ALJ need not weigh each of these factors in every case; rather, the evaluation is dependent upon the specific evidence presented in each case. *Id*. (*citing* 2006 SSR LEXIS 5 at *5). However, an ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent

reviewer to follow the adjudicator's reasoning." 2006 SSR LEXIS 5 at *15.

Here, ALJ Randazzo gave less weight to Ms. Barcelona's opinion because "her assessment [was] not supported by her own treatment records" (Docket No. 11, p. 25 of 523). Specifically, the ALJ cited Ms. Barcelona's opinion that Plaintiff would miss three days of work per month or be off task twenty percent of the time as being inconsistent with Plaintiff's admitted activities of daily living and ability to care for his disabled son (Docket No. 11, p. 25 of 523). To support his decision, ALJ Randazzo noted Plaintiff's admitted ability to shop, cook, clean, do laundry, and manage his own finances (Docket No. 11, pp. 22, 24, 49-50, 53-54, 56 of 523). Plaintiff also reported being able to read a newspaper, use a computer, take the bus, and attend sporting events (Docket No. 11, pp. 22, 24, 51-52, 54, 56-57 of 523). He even planned to move to the Phillippines to live with a woman he had fallen in love with over the internet (Docket No. 11, pp. 22, 40, 397 of 523).

The ALJ also took note of Plaintiff's relatively conservative care and treatment (Docket No. 11, p. 27 of 523). Despite Ms. Barcelona's extremely limiting October 2011 Mental Residual Functional Capacity assessment, Plaintiff only saw Ms. Barcelona a total of nine times over a two-year period (Docket No. 11, pp. 298-523 of 523). Furthermore, in September 2009, Plaintiff's GAF score was fifty-five (Docket No. 11, pp. 21, 330 of 523). By May 2010, this score had increased to sixty-five, indicating only *some* mild symptoms with the ability to generally function pretty well, and remained at this level at least through June 2011 (Docket No. 11, pp. 353, 454 of 523). During his visits with Ms. Barcelona, Plaintiff was consistently cooperative, polite, alert, oriented, and displayed a coherent thought process and content (Docket No. 11, pp. 298-523 of 523). Plaintiff has held steady employment in the past (Docket No. 11, p. 59 of 523) and has even completed two years of college (Docket No. 11, p. 223 of 523).

Plaintiff alleges that the ALJ's opinion is further flawed due to his alleged failure to discuss and accept Dr. Krosky's opinion in its entirety (Docket No. 16, p. 11 of 13). Plaintiff especially takes note of Dr. Krosky's testimony regarding the possible presence of "Paragraph C" criteria and Plaintiff's ability to operate under stress (Docket No. 16, pp. 11, 73 of 13). It is the sole prerogative of the ALJ to determine whether or not a claimant has met the "Paragraph C" criteria. *See* 20 C.F.R. § 404.1527(d).

Here, ALJ Randazzo disregarded Dr. Krosky's speculation, stating

> In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The evidence does not document the existence of a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause claimant to decompensate. The evidence does not document a history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement during the period in question.

(Docket No. 11, p. 23 of 523). Based on a review of the record, the Magistrate finds the ALJ's opinion to be based on substantial evidence. There is no evidence in the record that Plaintiff has ever experienced an episode of decompensation (Docket No. 11, pp. 298-523 of 523). Nor is there any evidence that Plaintiff's mental health impairments necessitate his living in some type of highly supportive living environment (Docket No. 11, pp. 298-523 of 523). In fact, Plaintiff took in and cared for his adult mentally disabled son without any assistance. Furthermore, Dr. Krosky does not provide any support as to why she is concerned about the possible presence of "Paragraph C" criteria or Plaintiff's alleged inability to operate under stress. Plaintiff's counsel, during cross-examination, was also unable to secure a definite answer from Dr. Krosky on these issues (Docket No. 11, pp. 76-77 of 523). Dr. Krosky even admits that she "can't be certain" (Docket No. 11, p. 76 of 523). Additionally, Dr. Krosky agreed with the ALJ that Plaintiff was capable of performing medium work with some

18

additional limitations, including: (1) simple, routine work; (2) no high-production quotas or strict time requirements; (3) no arbitration, negotiation, or confrontation; and (4) only superficial interaction with the public (Docket No. 11, pp. 25-26, 72-74 of 523). Therefore, based on a review of the record, Plaintiff's assignment of error is without merit. Accordingly, the Magistrate recommends that the decision of the Commissioner be affirmed.

### VIII. CONCLUSION

For the foregoing reasons, the Magistrate recommends that the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong<br>
United States Magistrate Judge

Date:   January 10, 2014

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.